1

2   Mark Mausert
    NV Bar No. 2398
3   729 Evans Avenue
    Reno, NV 89512
4   (775) 786-5477
    Fax  (775) 786-9658
5   mark@markmausertlaw.com
    *Attorney for Plaintiffs*

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                    **IN AND FOR THE DISTRICT OF NEVADA**

10

11  CHELSEA LONG & JULIE RAMOS,              Case No.: 3:19-CV-00652-LRH-CLB

12              Plaintiffs,

13       vs.

                                            **PLAINTIFFS' OPPOSITION TO**
14                                          **DEFENDANTS' MOTION TO**
    DIAMOND DOLLS OF NEVADA, LLC,           **DISMISS**
15  dba SPICE HOUSE, JAMY KESHMIRI,
    KAMY KESHMIRI, CLIFTON KYLE
16  SMITH and  DOES I-X,

17              Defendants

18  _____/

19         COME NOW plaintiffs, through counsel, and hereby oppose the defendants' Motion to

20  Dismiss Second Amended Complaint (hereinafter "Motion").  This Opposition is supported by

21  the pleadings and documents on file herein and by the accompanying points and authorities.

22                              Points and Authorities

23                                 Standard of Review

24         Because a Rule 12(b)(6) motion is before the Court, the Court should presume all well-

25  pleaded allegations are true; all reasonable doubts and inferences are to be resolved in the

26  plaintiffs' favor; and the Second Amended Complaint and Jury Demand is to be viewed in the

27  light most favorable to plaintiffs.  *Fitzgerald v. Barstable Sch. Comm.,* 555 U.S. 246, 249, 129

28

                                        Page 1

S.Ct. 788, 792, 172 L.Ed. 2d 582 (2009).  None of plaintiffs' claims are to be dismissed based upon subjective disbelief, or a view those claims are merely unlikely to be viable.  *Bell v. Atlantic Corp. v. Twombly*, 550 U.S. 544, 555-56, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007).  Detailed factual allegations are not required.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).  Plaintiffs enjoy "the benefit of imagination".  *Bissessur v. Indiana Univ. Bd. of Trustees,* 581 F.3d 599, 602-03 (7th Cir. 2009).  The Second Amended Complaint and Jury Demand should be read with these liberal construction principles in mind, along with common sense.  "Context matters in notice pleading."  *County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008).  The context of this case is terrible.  Defendants are not normal defendants.  These defendants have been running a criminal enterprise in downtown Reno, for years.  For whatever reasons, the authorities have allowed defendants to play fast and loose with providing alcohol to underage women, steering those women into prostitution and maintaining a work environment rife with the threat of sexual abuse and with intense sexual hostility.  The Second Amended Complaint and Jury Demand is a lengthy document – not because I enjoy writing lengthy complaints (I don't), but because this case presents a lengthy and somewhat complex fact pattern.

### Argument: THE PLAINTIFFS TIMELY FILED WITH THE NEVADA EQUAL RIGHTS COMMISSION.

Defendants' argument, to the effect plaintiffs did not timely file, is based upon a misreading of the Second Amended Complaint and Jury Demand (hereinafter "Complaint").  Defendants appear to have read the Complaint in a very selective manner, so as to artificially limit the scope of plaintiffs' allegations.  For instance, defendants write:

> Indeed, Ramos admits in both her declaration filed as Exhibit 4 to the Complaint, and in her NREC complaint that she did not personally experience any harassing incidents after January of 2015, approximately four years before she filed her Title VII complaint with NERC.

Motion, p.2, lines 10-13.

This is a misleading statement.  More importantly, defendants ignore the "mere presence" doctrine the Ninth Circuit articulated in *Ellison v. Brady,* 924 F.2d 872, 883 (9th Cir. 1991).

1   There, the Court recognized, if sexual misconduct is severe enough, the "mere presence of a

2   harasser may constitute a sexually hostile work environment.  That is precisely what occurred

3   here.  Both plaintiffs describe in their NERC Charges of Discrimination how they  interacted

4   with defendant Smith after Ms. Long was subjected to an Open and Gross Lewdness by

5   defendant Smith in the late spring of 2018 – *and after Smith was rehired several months later.*

6   That is, Smith approached Ms. Long as she was sleeping and pulled her pants and panties down

7   and then masturbated to ejaculation as he stood over her.  Ms. Long awoke as she was being

8   disrobed and was terrified.  She pretended to unconsciousness.  After Smith finished, Ms.

9   Ramos was the first person Ms. Long encountered and she related, almost hysterical with fear,

10  the details of the encounter.  Ms. Ramos caused the incident to be reported and Mr. Smith's

11  employment was, temporarily, terminated.  See, Charge, p.3, defendants' Exhibit 2 (there is

12  some question whether Smith, given his pandering talents and the resultant stream of income

13  he generated was actually fired (he frequented the Spice House during the period he was

14  "fired")).  On March 16, 2019, Ms. Ramos was told by Ms. Long of an alleged rape, committed

15  by Smith (after he was rehired), on the premises of the Spice House.  A female patron accused

16  Mr. Smith of raping her in the women's room.  Smith admitted he had sex with the woman and

17  informed the police he was alone in the room with her.  Defendant's General Manager David

18  Hoffman *lied to the police on Smith's behalf.*  That is, Hoffman told investigating police

19  officers he was present with Smith and the woman and Smith had not had sex with her.  In her

20  Charge, Ms. Ramos states:

21      On Sunday, March 17, 2019 all the female employees had a meeting with Co-Owner
        Kamy Kashmiri [sic "Keshmiri"] at Sierra Gold and we were told by Mr. Kamy
22      Kashmiri that we were ganging up on Mr. Hoffman.  Mr. Kashmiri told us that all the
        employees and Mr. Hoffman need to get along since Mr. Smith was gone.  ***When***
23  ***Mr. Hoffman found out we had a meeting with Mr. Kamy Kashmiri, I received***
    ***a text that I was fired Sunday, March 17, 2019.***

24      On or about March 20, 2019, I along with other female employees had a scheduled
25      meeting with Mr. Kamy Kashmiri [sic "Keshmiri"] to voice our concerns.  Mr.
        Kashmiri advised us again that Mr. Smith had been discharged.  I complained to Mr.
26      Kashmiri that I do not feel that the workplace is safe, nor is it free of discrimination,
        as Mr. Smith was continually rehired.

27
28      ***On numerous occasions, I was pressured by Mr. Smith to witness and/or participate\***
        ***in Pandering***.  I was extremely offended by this type of behavior.  ***The incidents listed***

1     ***are not all inclusive of the treatment I was subjected to.***

2 Ramos Charge of Discrimination, pp.3-4 (emphasis added).

3        The defendants would have the Court ignore three separate bases, each one sufficient to

4 defeat their limitations argument.  First, when defendants rehired Smith after he assaulted Ms.

5 Long, his "mere presence" was offensive to both plaintiffs. They knew Smith was a sexual

6 predator, who routinely arranged prostitution liaisons on the premises of Spice House.  Ms.

7 Ramos heard first-hand how Smith had disrobed her friend, Ms. Long and terrified her while

8 masturbating.  And, of course, Ms. Long was the one who was battered and assaulted.

9 Plaintiffs knew the defendants were unlikely to protect them, i.e., incredibly, while knowing

10 Smith had committed an Open and Gross Lewdness while at work, on the premises, they

11 rehired him.  Any doubt as to the validity of plaintiffs' fears were borne out on the night of

12 March 15, 2019, when Smith is alleged to have sexually assaulted a female patron.  Any doubt

13 as to the level defendants would sink in protecting their chief panderer were resolved when

14 General Manager Hoffman immediately stated an intent to lie so as to falsely exculpate Smith.

15 Hoffman proceeded to do just that, *with the other defendants' tacit approval.*  Hoffman's

16 action was itself an act of sexual harassment – especially when considered in context, i.e., he

17 shielded the same individual whose mere presence created a sexually hostile work environment

18 from criminal prosecution relative to an alleged rape on the premises, in order to allow Smith

19 to continue to create prostitution liaisons!

20      Smith's "mere presence", as of his rehiring, created and maintained a sexually hostile

21 work environment.  A reasonable woman, similarly situated to either plaintiff would have

22 regarded the work environment as sexually hostile, i.e., very scary, and plaintiffs did so view

23 the work environment.

24        General Manager Hoffman texted both plaintiffs and told them they were fired because

25 they opposed his illegal attempt to insulate Smith from his alleged rape of a female patron.

26 Hoffman had no personal knowledge of what occurred in the women's room between Smith

27 and the patron.  He was not present.  Yet, he lied on Smith's behalf as to his own presence in

28 the women's room.  And, Ms. Long knew he lied, and told Ms. Ramos.  Ms. Long knew

because Hoffman told her he intended to lie to police.  In confronting Kamy Keshmiri about

General Manager Hoffman's lie, Ms. Ramos was opposing sexual harassment in its worst form,

i.e., an alleged sexual assault committed on premises by an employee with a known history of

criminal sexual misconduct and the concealment thereof from law enforcement.  That is

opposition to sexual harassment.  In response, General Manager Hoffman sent a text and

instructed plaintiffs they were fired. ***That is an act of retaliatory hostility, i.e., sexual***

***harassment***.   See, e.g., *Draper v. Coeur Rochester*, 147 F.3d 1104 (9th Cir. 1998) (when

erotic-based conduct is morphed into acts of retaliatory hostility (in *Draper* the act consisted

only of derisive laughter as opposed to an attempted firing) the acts of retaliatory hostility are

considered acts of sexual harassment).  That the Keshmiris apparently rescinded the

termination does not in any way alter the fact General Manager Hoffman committed an act of

retaliatory/sexual hostility.  That act started the 300 day limitations period running anew. And,

of course, there is the added factor of a lack of trust, i.e., both plaintiffs did not believe the

Keshmiris' assurances Smith was gone for good.  Furthermore, at the meeting presided over by

Jamy Keshmiri, plaintiffs were berated.  For example, somehow, the criminal battery and

assault committed upon Ms. Long was Ms. Long's fault – because she drank alcohol after her

shift and laid down on a couch in a VIP room.  Jamy Keshmiri's belligerent comments, which

denigrated plaintiffs and their reasonable fears, constituted an act of sexual harassment –

directly analogous to Anelli's derisive laughter in *Draper.*

Then there is the matter of the constant pandering, i.e., both plaintiffs routinely

witnessed Smith providing hard liquor to underage women and pressuring them into engaging

in prostitution.  The Charge does not provide dates, true, but the Complaint clarifies.   See, e.g.,

page 5 of the Complaint. Both plaintiffs were very aware of Smith's activities and of the

adverse effect his conduct had upon women who had just reached the age of 18.  Many young

women wind up in harsh economic straits, e.g., they are compelled to leave an abusive home

environment, or simply lack the skills to support themselves adequately.  So, they seek to cash

in on their attractiveness by providing lap dances, i.e., the entertainment which accords with

defendants' licensure.  Instead of allowing women to engage in this relatively harmless form of

entertainment, defendants arranged to have Smith laying in wait.  After illegally providing

copious amounts of liquor to underage and inexperienced women, he cajoled them into acts of

prostitution.  See, Complaint, pp.5-7.  Both plaintiffs were aware many young women who

were trafficked in this manner did not return, and inferred they did not return because of trauma

attendant to the experience.  Both plaintiffs were offended.  The Complaint resolves the

limitations issue.

The ongoing scheme involving the facilitation of prostitution is described in paragraph

3 (pages 2-3) in the *present* tense.  See, e.g., "Because Jamy Keshmiri and Kamy Keshmiri

routinely use the Spice House to facilitate criminal activities, . . ."  Page 3, lines 5-9.  The

Complaint directly alleges plaintiffs were offended by defendants' ongoing prostitution

criminal enterprise.  "Plaintiffs were also offended by defendants' practice of causing young

women to become intoxicated and pressuring them into becoming prostitutes."  Complaint,

pp.6-7.  Defendants' limitations analysis does not discuss this ongoing offense, which

continued until the day plaintiffs resigned.  Defendants cannot, without acknowledging there is

no limitations defense. And, of course, the technical limitations analysis is in accord with the

Circuit's substantive Title VII analysis.

> As in most claims of hostile work environment harassment, the discriminatory acts were not always of a nature that could be identified individually as significant events; instead, the day-to-day harassment was primarily significant, both as a legal and a practical matter, in its cumulative effect.  Because Draper's hostile work environment claim is not based upon a series of discrete and unrelated discriminatory actions, but is instead premised upon a series of closely related similar occurrences that took place with the same general time period and stemmed from the same source, her allegations set forth a claim of a continuing violation.

*Draper v. Coeur Rochester,* 147 F.3d 1104, 1108 (9th Cir. 1998).

**Argument: DEFENDANTS' INDIVIDUAL LIABILITY TITLE VII ARGUMENT DOES NOT PROPERLY ADDRESS THE LEGAL THEORY STATED IN THE COMPLAINT.**

Usually, Title VII liability does not lie against individuals, i.e., individuals who do not

formally identify themselves as employers, but who are owners or exert direct management

control over a limited liability company or corporation, are not proper Title VII defendants.

Here, plaintiffs allege the Keshmiri brothers are not entitled to the benefit of the protection

usually afforded by the limited liability company for – *because they are estopped from using that form as a shield as the result of using Diamond Dolls of Nevada, LLC to engage in systemic, long-term criminal activity.*   Aside from mentioning the general principle Title VII applies to employers, defendants have not proffered any meaningful discussion of the piercing the corporate veil, or in this case the limited liability company veil, principle.   The Complaint is clear.   It reads in relevant part:

> They are estopped from using the limited liability company as a shield to personal liability – especially since the harm plaintiffs sustained was directly and integrally related to the criminal activities from which the Keshmiris routinely profit.  That is, because of the Keshmiris' personal involvement in illegal activities, such as cajoling women to engage in prostitution; providing alcohol to underage women so as to encourage them to engage in prostitution; conspiring to arrange for prostitution transactions; etc., they are to be deemed the employers of plaintiffs and therefore personally liable.

Complaint, p.3, lines 8-15.

"Limited-liability companies (LLCs) are business entities created "to provide a corporate-styled liability shield with pass-through tax benefits of a partnership." *Weddell v. H2O, Inc.,* 128 Nev. 94, 102, 271 P.3d 743 (2012) (citations omitted).   The alter ego doctrine requires the following elements:

> (1) The corporation must be influenced and governed by the person asserted to be its alter ego[;] (2) There must be such unity of interest and ownership that one is inseparable from the other; and (3) The facts must be such that adherence to the fiction of a separate entity would, under the circumstances, sanction a fraud or promote injustice.

*Truck Ins. Exch. v. Palmer J. Swanson, Inc.,* 124 Nev. 629, 635, 189 P.3d 656 (2008).

Here, Diamond Dolls is, apparently, owned and operated by the Keshmiri brothers.   The Keshmiri brothers are alleged to be integrally involved in the day-to-day operation of the Spice Club, which is owned by Diamond Dolls.   The licensure of Diamond Dolls does not contemplate facilitating prostitution.   To the contrary Diamond Dolls is confined to lawful activities.   And even if that licensure did provide for prostitution, such a provision would be void.   That is, prostitution is not permitted in Washoe or Clark Counties.   That fact is subject to judicial notice.   If, as alleged, the Keshmiri brothers have been operating and profiting from a prostitution business, using the guise of the Diamond Dolls limited liability company form,

permitting them to hide behind that LLC form would promote injustice and would effectively promote a fraud.  The Keshmiris could arrange for the LLC to become insolvent and thereby leave plaintiffs without effective Title VII remedies.  And, the facts and circumstances of this case indicate such an eventuality is likely to come to pass.  There is a strong odor of financial impropriety already.  If the allegations are true, i.e., if the Keshmiris have, for years, been raking in cash per the "buy out" fee scheme, i.e., taking about $400 in cash every time a dancer leaves the premises with a patron for the purpose of having sex, have the Keshmiris been reporting this long-term, large stream of cash revenue to the United States Treasury?  Probably not.  The same mentality which will cause an eighteen year-old to become intoxicated and shunt her into prostitution is the same mentality which will fail to report the resultant profit.  If the allegations are true, the Keshmiris have overseen immense psychological harm to many, many young women and have been conducting a continuing criminal enterprise after co-opting local government officials.  And, of course, for purposes of adjudication of this Motion, the Court should assume the allegations are true and further, should draw the reasonable inference the Keshmiris have been using the limited liability company form to obtain illegal income and then failing to pay taxes on that income.  It is a rare day when a seasoned criminal honestly reports the income derived from an *ongoing* criminal enterprise to the United States Treasury.  To do so would imperil the viability of the ongoing criminal enterprise and facilitate prosecution thereof.  That, after all, was the motivation for the Keshmiris temporarily suspending the "buy out" fee scheme while they under the scrutiny of the City of Reno.

The defendants argue the Complaint fails to allege Jamy and Kamy are alter egos of Diamond Dolls, LLC.  Motion, pp.19-20.  That is not true. As noted above, the Complaint alleges the Keshmiris are personally involved, and personally profit, from systemic criminal conduct, which they personally oversee.  Further, the Complaint alleges the Keshmiris received the "buy out" fees, i.e., a cut of the prostitution proceeds.  Complaint, p.4, lines 6-12.  The Complaint alleges:

> Jamy Keshmiri and Kamy Keshmiri, prior to 2019, had a history of using the Spice House to facilitate prostitution, and to profit from sytemic, organized and controlled prostitution.  That is, the Keshmiri borthers designed and oversaw a system whereby

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

women, who originally intended only to dance, were pressured and/or enticed into engaging in prostitution.

Complaint, p.5, lines 11-15.

The Complaint alleges Kamy Keshmiri personally provided alcohol to underage women on the premises of the Spice House.  Complaint, p.6, lines 13-14.  Kamy Keshmiri overrode General Manager McPartlin's attempt to run a clean club.  Complaint, p.6, lines 15-18; also see, McPartlin Affidavit, which accompanies the Complaint and is incorporated therein. Former Manager Brandon Lennar trivialized plaintiff Ramos' initial complaint of sexual harassment by Smith by stating, "[t]hat's how he is".  Complaint, p.7, lines 21-26.  The plaintiffs were aware of the inherent protection, provided to the defendants as the result of the fact members of the City Council availed themselves of the libertine pleasures of the Spice House.  Complaint, p.8, lines 1-11.  The Keshmiris covered all of their bases.  They skirted the line, and to all appearances, did not actually cross over into human trafficking via the use of coercion.  Instead, they had Mr. Smith – a man very adept at feeding alcohol to underage women and arranging prostitution liaisons at one thousand dollars a pop.

### Argument: THE ALLEGATIONS EASILY SUSTAIN CAUSES OF ACTION FOR RETALIATION.

Defendants are apparently confused.  Plaintiffs do not premise their retaliation claim on a classic protected activity/adverse response analysis.  That is, notwithstanding General Manager Hoffman's attempt at retaliation, plaintiffs were not fired per that attempt.  Instead, they constructively discharged because of Smith's conduct; Smith's rehiring; the toleration of Smith's conduct by the other defendants; the ongoing profiteering from Smith's pandering and prostitution activities, along with the apparent intent of the Keshmiris to continue to engage in the systemic sexual abuse of young women; the alleged sexual assault of a female patron on March 15, 2019, by Smith on the premises of the Spice House; General Manager Hoffman's outright lie to a Reno police officer for the purpose of protecting Smith from the consequences of sexual assault; defendants' toleration/ratification of General Manager Hoffman's lie; the trivialization of the sexual harassment plaintiffs endured; and the possibility defendants would

Page 9

rehire Smith, or hire a replacement for him who is possessed of a similarly abusive and

misogynistic orientation, etc.  A constructive discharge is considered a form of retaliation.

Accordingly, the protected activity analysis is not implicated by the Complaint.  That is the

standard "opposition to sexual harassment/adverse action/nexus between the two" analysis is

not in play.  Accordingly, the analyses found at pp.9-10 of the Motion are irrelevant.

In *Pennsylvania State Police v. Suders*, 524 U.S. 129, 124 S.Ct. 2342, 159 L.Ed.2d 204

(2004), the Court discussed the concept of constructive discharge.

> Beyond that, [establishing a sexually hostile work environment existed] we hold, to
> establish "constructive discharge," the plaintiff must make a further showing: She must
> show that the abusive working environment became so intolerable that her resignation
> qualified as a fitting response.  An employer may defend against such a claim by
> showing both (1) that it had installed a readily accessible and effective policy for
> reporting and resolving complaints of sexual harassment, and (2) that the plaintiff
> unreasonably failed to avail herself of that employer-provided preventive or remedial
> apparatus.

124 S.Ct. at 2347.

The defendants cited the lack of a tangible job detriment, and imply such is necessary

for a constructive discharge.  Motion, p.10, lines13-21.  There is no such requirement.

Defendants note the plaintiffs have not claimed retaliation because they complained of Smith.

Motion, p.11, lines 5-8.  Then, the defendants emphasize the plaintiffs have not claimed their

working conditions became intolerable "based on retaliatory actions".  Motion, p.11, lines 10-

13 (emphasis in original).  There is no requirement the genesis of intolerable conditions sound

in retaliatory animus.  A constructive discharge may occur when an "abusive working

environment becom[es] so intolerable that [a] resignation qualifie[s] as a fitting response."  124

S.Ct. at 2347.  Plaintiffs do not allege their work environment was rendered intolerable *solely*

as the result of retaliatory animus.  That being noted, Hoffman's attempt to fire the plaintiffs,

sans any meaningful response by defendants, i.e., discipline directed at Hoffman *did* contribute

to the constructive discharge.  So, if defendants are looking for a technical requirement – there

it is.  Plaintiffs allege their work environment became intolerable for a number of reasons, of

which retaliatory animus was only one.  For instance, plaintiffs allege sexual hostility because

defendants ran a prostitution business in violation of their licensure and allowed a work culture

to develop which was extraordinarily sexually abusive.  It included repeated requests by Smith

to Ms. Ramos to provide her panties to him; trivializing Smith's conduct while failing to

discipline him; providing liquor on a regular basis to underage women for the purpose of

facilitating prostitution; routinely arranging prostitution liaisons, while using a semantical

sleight-of-hand, i.e., a "buyout fee", to profit thereby; an Open and Gross Lewdness, committed

by Smith against Chelsea Long; rehiring Smith while failing to supervise him after he

committed the Open and Gross Lewdness, i.e., defendants implicated the "mere presence"

analysis found in *Ellison v. Brady,* 924 F.2d 872, 883 (9th Cir. 1991); the obvious motivation

for rehiring Smith, to wit, he was very adept at pandering and made the Keshmiris lots of

money, i.e., not only was Smith's presence tolerated, but plaintiffs were aware, because of his

financial utility, he was unlikely to be disciplined, unless he engaged in extreme conduct;

Smith's attempt to trivialize his conduct via telling Ms. Long and the management of the Spice

House his encounter with Ms. Long was consensual; instructions to Spice House personnel to

refrain from summoning police – even when their presence might be necessary; the alleged

rape of a female patron on premises by Smith; General Manager Hoffman's immediate lie to

police for the purpose of falsely exculpating Smith (the lie worked and Smith was neither

arrested or charged); the failure of the Keshmiris to repudiate the lie of their General Manager

– which constitutes a ratification thereof; maintaining General Manager Hoffman in his

position, sans discipline, notwithstanding his false exculpation of Smith; the attempt by

General Manager Hoffman to fire the plaintiffs in response to contact they effected with Jamy

Keshmiri for the purpose of complaining;  the trivialization of plaintiff's concerns at the March

20, 2019, meeting with Jamy Keshmire and General Manager Hoffman; and the attempt to

ascribe blame to the plaintiffs at that same meeting.  That's quite a list.  The severity far

exceeds that which attends an average hostile work environment case.  Defendants would have

the Court believe the Keshmiris manifested some sort of sea change, merely because Smith was

fired, again. That is an outlandish proposition.  As noted the Keshmiris did nothing to rectify

the false exculpation provided by General Manager Hoffman.  Indeed, Hoffman was allowed to

attend the March 20, 2019 meeting and participated in ganging up on the plaintiffs.  The

1    Keshmiris fired Smith only because his alleged conduct was so outrageous they had to take

2    *some* action. There was no sea change – as evidenced by Hoffman's toying with the idea of

3    firing the plaintiffs and then the grudging manner in which action was taken – coupled with a

4    lecture directed at the plaintiffs.  Any doubt is resolved by the failure of the Keshmiris to

5    correct Hoffman's exculpatory lie.  And, the reasonable inference is obvious – the Keshmiris

6    are scared of Mr. Smith.  He knows enough to, probably, get them indicted and certainly put

7    out of business.

8            Defendants cite a Fifth Circuit case for the proposition harassment alone cannot sustain

9    a constructive discharge cause of action.  Motion, p.11.  Reno is not located within the Fifth

10   Circuit.  It is located in the Ninth Circuit and the Decisions of the Ninth Circuit are binding

11   within the geographical boundaries of the Ninth Circuit.  *Zuniga v. United Can Co.,* 812 F.2d

12   443, 450 (9th Cir. 1987).  Furthermore, the defendants' argument makes little sense.

13   Defendants contend, regardless of how abusive, nasty and actionable a work environment may

14   be – a technical requirement of an act of retaliation should be interposed before a constructive

15   discharge is deemed to be possible. Title VII is a remedial statutory scheme.  It is to be liberally

16   construed – as opposed to being twisted into technical knots which serve to defeat the purpose

17   of the statutory matrix.  Implicit in the defendants' argument is a request to trivialize the effects

18   of severe sexual harassment  – in this case, that harassment includes the presence of a known

19   sexual predator.  In other words, it just can't be that bad, unless the technical requirement of an

20   act of retaliation is met.  In *Ellison v. Brady,* 924 F.2d 872, 879-80 (9th Cir. 1991), the Court

21   repudiated such an approach.

             By acknowledging and not trivializing the effects of sexual harassment on reasonable
22           women, courts can work towards ensuring that neither men nor women will have to
23           "run a gauntlet of sexual abuse in return for the privilege of being allowed to work
             and make a living."  *Henson v. Dundee,* 682 F.2d 897, 902 (11th Cir. 1982).

24           According to defendants' analysis a woman, who is earning a high salary, must either
25   endure egregious sexual harassment so bad it renders the workplace intolerable (which occurs

26   sans retaliation), or take her chances on obtaining a high award for emotional damages (which

27   are capped), without compensation for the economic harm which attends a resignation, i.e., a

28

constructive discharge.  There is to be a technical requirement, which does not make any sense when the nature of a constructive discharge is considered, interposed so as to defeat the remedial purposes of Title VII.  The Ninth Circuit does not subscribe to this contorted analysis – just as the Supreme Court did not in *Pennsylvania State Police v. Suders*, 524 U.S. 129, 124 S.Ct. 2342, 159 L.Ed.2d 204 (2004).

> Defendants have misapprehended the retaliation cause of action.  They write: Here, Plaintiffs' claims are based upon an alleged constructive discharge because of retaliation, yet they do not allege any retaliation, much less a pattern of it which was so severe as to require them to quit.

Motion, pp.11-12.

Constructive discharge is a form of retaliation and is the only form of retaliation alleged. Plaintiffs do contend retaliatory hostility, which is actionable as a form of sexual harassment (*Draper v.  Coeur Rochester*, 147 F.3d 1104 (9th Cir. 1998)) occurred.  The source of defendants' confusion is not apparent, but the assertion plaintiffs allege a constructive discharge "because of retaliation" is flatly incorrect.

> Like a hostile work environment claim, a claim for constructive discharge usually results from a series of discriminatory actions on the part of the employer that are in the nature of a continuing violation: A constructive discharge occurs when a person quits his job under circumstances in which a reasonable person would feel that the conditions of employment have become intolerable.  *Steiner v. Showboat Operating Co.,* 25 F.3d 1459, 1465 (9th Cir. 1994).  In such cases the individual has simply had enough; she can't take it anymore.

147 F.3d at 1110.

In *Draper* there was no act of retaliation – other than the constructive discharge itself. Defendants are attempting to impose a requirement for constructive discharge which is not recognized by the Ninth Circuit, and instead which is implicitly rejected.  It is easy for a harasser to render a work environment intolerable absent a discrete act of retaliation.  And, as noted, there is no compelling, or even logical reason to require a discrete act of retaliation as a predicate.  To do so would artificially limit the remedies of employees who are subject to egregious and nasty actionable harassment – to the point at which they have no practical course except to leave.

### Argument: THE NEGLIGENCE CLAIMS ARE WITHIN THE LIMITATIONS PERIOD.

1    Defendants cite the two year limitations period and imply plaintiffs' negligence claims

2    are not timely filed.  Motion, p.13, lines 12-15.  As alleged in the Complaint, defendant Smith

3    battered plaintiff Long in June or July of 2018.  See, Complaint, p.5, lines 23-24.  He was

4    thereupon "fired" and about four months later, i.e., toward the end of 2018, was rehired.  After

5    he was rehired, plaintiffs allege he was negligently supervised and retained.  The Complaint

6    was filed in 2019 – well within the limitations period.

7         **PLAINTIFFS' NEGLIGENCE CLAIMS RE SEXUALLY HOSTILE WORK
          ENVIRONMENT CLAIMS**

8
9         Defendants' argument regarding the application of a negligence theory to hostile

10   work environment claims appears to be correct. See, e.g., Motion, p.14. That is, the application

11   of negligence theory appears to be redundant to litigating the Title VII claims themselves.

12   Accordingly, plaintiffs acquiesce to the dismissal of their negligence claims insofar as applied

13   to Title VII liability.  That is, there does not appear to be viable negligence causes of action

14   based on a theory defendants had an obligation to protect them from a sexually hostile work

15   environment.  That being noted, Ms. Long's negligence claims survive based on the common

16   law torts Smith committed against her.  See below.

17        **Argument: PLAINTIFF LONG'S NEGLIGENCE CLAIMS RELATIVE TO
          TORTS COMMITTED BY DEFENDANT SMITH ARE VIABLE.**

18        Title VII does not preclude a plaintiff from invoking supplement jurisdiction so as to

19   seek relief relative to state tort claims.  It is, after all, a remedial statutory scheme which is

20   intended to expand employees' remedies, as opposed to contracting them.  Accordingly, even if

21   the limitations period regarding the first time Smith was rehired may have elapsed regarding

22   plaintiff Long, the other defendants are still liable regarding negligent retention and negligent

23   supervision – as well as ratification for the battery, assault and false imprisonment committed

24   upon plaintiff Long in June or July of 2018.  And, defendants are liable re Ms. Long for

25   negligent retention and supervision of Smith – he should never have been allowed to be in a

26   position where at he was able to assault and batter Ms. Long while she was sleeping.  The

27   Complaint is replete with allegations, to the effect the Keshmiris have been on notice for a very

28   long time Smith was dangerous.  Per the Complaint, Smith has been engaged in systemic

Page 14

1   criminal conduct pursuant to sexually abusing young women, for a long time, with the other

2   defendants' knowledge and approval – for the purpose of enriching Smith and the other

3   defendants.  See, e.g., Complaint, pp. 2-6.  Furthermore, as alleged in the Complaint, plaintiff

4   Ramos complained to defendants in 2014 of Smith's sexual harassment.  Complaint, p.14, lines

5   23-28.  Ms. Ramos' complaints were trivialized.  She was told by defendants' former General

6   Manager, Brandon Lennar, "[t]hat's how he is".  The Complaint states:

> As stated, plaintiff Ramos was regularly sexually harassed by defendant Smith, e.g.,
> Smith would ask plaintiff Ramos for her panties, i.e., he would ask plaintiff to take
> her panties off and give them to him; would offer to buy her lingerie–so she could
> wear such for him; etc.  Plaintiff Ramos complained to then General Manager Brandon
> Lennar, who trivialized the complaint by stating, "[t]hat's how he is", ***while refusing
> to take action***.

Complaint, p.7, lines 21-26.

Defendants quote and cite cases such as *Peterson v. Miranda*, 57 F.Supp.3d 1271, 1280

(D. Nev. 2014) (Motion, p.13, lines 17-21), but essentially ignore the content of the Complaint.

Defendants knew, since 2014, when Ms. Ramos complained of sexual harassment by Smith,

Smith had a propensity for sexual harassment.  They did nothing.  Defendants knew, all along,

Smith was engaged in criminal pandering, i.e., he was fostering prostitution.  Defendants knew

Smith was aggressive sexually, i.e., he did not just confine his activities to pandering, but

entered the dressing room of the dancers, fed underage women alcohol so he could take

advantage sexually, bragged of his status and activities as a "pimp" and generally viewed the

workplace as a sexual hunting ground.  The Complaint meets the requisite standard.

Defendants write, "[a]dditionally, negligent hiring liability is imposed when the employer knew

or should have known the employee was aggressive or violent and might engage in injurious

conduct.  *Yunker v. Honeywell, Inc.*, 496 N.W.2d 419, 422 (Minn.Ct.App. 1993)."  Motion,

p.13, lines 24-26.  Precisely.  A litany of misconduct is recited, beginning at page 12 of the

Complaint.  Any doubt as to defendants' culpability for negligence is illustrated by General

Manager Hoffman's reaction to allegations Smith sexually assaulted a patron in the women's

room of the Spice House on March 15, 2019.  Hoffman went into gear and stated an intent to

lie to Reno police officers and then did just that, i.e., he falsely told investigating officers he

1   was in the women's room with Smith and the patron and nothing happened.  See, Complaint,

2   p.17.  Smith told investigating officers he and the patron were alone, but that the patron

3   consented to sex.  In other words, General Manager Hoffman acted consistent with the

4   defendants' long-term policy – when in doubt, cover up sexual misconduct, especially by

5   Smith, by discouraging employees from speaking with police, and if necessary by outright lies.

6   The Complaint raises questions of fact not susceptible to resolution via a Motion to Dismiss.

7        Although plaintiff Ramos may not be able to sustain negligence causes of action,

8   plaintiff Long does have viable causes of action, per supplemental jurisdiction.  She was

9   assaulted, battered and subject to false imprisonment, i.e., subjected to common law torts as the

10  result of defendants' negligence.

11       Plaintiff Long's negligence causes of action do not sound in the allegation defendants

12  had a duty to protect her from sexual harassment – as implied by defendants.  Motion, p.15,

13  liens 26-28.  Plaintiff Long's negligence causes of action sound in the proposition defendants

14  were possessed of the duty to protect her from assault, battery and false imprisonment by an

15  employee with a known propensity for engaging in sexual misconduct and sexually-related

16  crimes.   That is, defendants knew, since 2014, Smith was not fit to be around women,

17  unsupervised.  Defendants would focus on Smith's hiring, but negligent supervision and

18  negligent retention are also alleged.  There is no viable defense to those causes of action –

19  given Ms. Ramos' 2014 report of Smith's sexual harassment; Smith's integral involvement in

20  pandering and prostitution; the open manner in which he invaded the dancers' dressing room;

21  etc.  Ms. Long has alleged distress flowing from Smith's attack on her in 2018.  Defendants'

22  attempt to shift the focus (Motion, pp.16-17) should not be well taken.  The negligence causes

23  of action do not sound in harm resulting from the attack on a patron, but rather in Smith's

24  attack upon Ms. Long.  To the extent the negligence causes of action may be interpreted as

25  sounding in a duty to protect against sexual harassment, plaintiffs acknowledge such a cause of

26  action is probably not viable, i.e., there does not appear to be a common law duty to protect

27  against sexual harassment.

28       **Argument: PERSONAL LIABILITY RE COMMON LAW TORTS IS**

Page 16

**APPROPRIATE.**

Plaintiffs have alleged facts which justify piercing the company veil.  Defendants argue

only an employer may be held liable.  Motion, p.17.  Plaintiffs allege the Keshmiris used

Diamond Dolls of Nevada, LLC to, essentially, conduct a criminal enterprise.  See, e.g.,

Complaint, pp.2-3.  Also see, the arguments stated above.

> That is, because of the Keshmiris' personal involvement in illegal activities, such as
> cajoling women to engage in prostitution; providing alcohol to underage women
> so as to encourage them to engage in prostitution; conspiring to arrange for
> prostitution transactions; etc., they [the Keshmiri brothers] are to be deemed the
> employers of plaintiffs and therefore personally liable.  Likewise, they are personally
> liable for the common law torts stated herein, both because of negligence and because
> they implicitly ratified defendant Smith's conduct.  Ratification occurred by the
> statements, actions and inaction of Jamy Keshmiri and Kamy Keshmiri and via the
> statements, actions and inactions of their employees, including General Manager,
> Mr. Hoffman.

Complaint, p.3, lines12-21 (see Argument herein, commencing at page 6 re the alter ego
doctrine, e.g., *Weddell*).

### Argument: DEFENDANTS' CAUSAL RELATIONSHIP/BUT FOR ARGUMENT IS NOT APPLICABLE.

Constructive discharge is a form of retaliation.  It is slightly different animal than the

normal retaliation cause of action – which involves opposition to sexual harassment and an

adverse action implemented in response to the opposition.  Accordingly, the arguments

defendants posit, beginning on page 12 of the Motion are not applicable.  Defendants appear to

be confused as to the fact a constructive discharge is a form of retaliation.

### Argument: PLAINTIFFS HAVE PROPERLY PLED OUTRAGE.

Defendants would impose a code pleading standard. They allege, "[h]owever, Plaintiffs

do not allege facts which would establish that Defendants conduct was done with the intention

or reckless disregard for the emotional distress for Ramos."  Motion, p.18, lines 14-15.

Plaintiffs do allege such facts.  After alleging a sordid course of conduct, by Smith and the

Keshmiri brothers, the Complaint reads:

> For example, the defendants rehired Smith, and thereby exposed plaintiffs to
> increased trauma and fear, because they wished to avail themselves of Smith's ability
> to exploit young women sexually, by causing them to become intoxicated and then
> engage in prostitution. . . .

> [The financial gain attendant to prostitution] was the motivation of hiring Smith,

1
2
3
4
5
6

rehiring Smith and for permitting Smith to roam the premises of the Spice House without supervision *after* defendants knew Smith had behaved as a sexual predator on the premises of the Spice House.  It was also the motive for concealing Smith's conduct from the Reno Police, and for berating the plaintiffs on March 20, 2019, and for Hoffman's attempt to fire both plaintiffs Financial gain was the motivation for discouraging plaintiffs, and others, from reporting Smith's activities to law enforcement.  Financial gain was also the motive for tolerating Hoffman's conduct, i.e., his lies to the police.  At all times herein mentioned, General Manager Hoffman acted within the course and scope of his duties, i.e., part of his job entailed concealing the conduct of Smith and facilitating Smith's ability to arrange prostitution liaisons.

Complaint, pp.18-19.

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Plaintiffs' allegations directly implicate the concept of reckless disregard.  They allege, for instance, defendants concealed, by both omission and commission, Smith's criminal acts of sexual abuse ***for the express purpose of continuing to profit from Smith's skill at pandering, i.e., at setting up prostitution liaisons***.   Elsewhere, via an allegation which is incorporated in the Outrage cause of action, plaintiffs allege, "[d]efendants were under a duty, given the nature of the business the Spice House conducts, to take stringent measures to protect the women who work in such an environment."  Complaint, p.14, lines 17-20.  In other words, defendants deliberately (or with reckless disregard) refused to abide by the duty to protect plaintiffs – because the sexual predator relative to whom protection was to be provided was too valuable financially to defendants.  Smith's ability to set up one prostitution liaison after another with older, well-off customers conferred on him a species of immunity.  The Complaint is clear. Smith was a known sexual predator re whom defendants maintained in their employment, in derogation of their duty to plaintiffs, because he was an expert panderer and thereby made defendants lots of money.  The contention defendants are not liable for Smith's conduct because of their alleged lack of knowledge of his propensities is belied by the very nature of his employment.  Defendants employed Smith because of his sexual predation skills.  On a regular basis, Smith provided alcohol to underage women and convinced them to engage in prostitution.  On a regular basis, defendants profited thereby.  Keeping Smith around is akin to keeping a leopard as a pet.  The owner is not allowed to claim surprise, and immunity, when the leopard acts out.  It is, after all, a leopard. That Smith would impulsively indulge his penchant for sexually abusing women is no surprise.  Sexually abusing women is what

1  defendants paid him to do.  The contention defendants did not behave with reckless disregard

2  (Motion, p.18, lines 14-16) fails when the Complaint is read in its entirety.  Defendants'

3  business plan and its modus vivendi were conceived with "RECKLESS DISREGARD" written

4  all over.  How many times did Smith traumatize a young woman who wanted only to dance in

5  order to pay rent or support her child?  How many times did a woman, who had been cajoled

6  into prostitution by Smith, profoundly regret the experience?  Defendants were content to let a

7  known sexual predator have the run of the place, and ply his trade, so long as they received

8  large amounts of cash on a regular basis – per the carefully labeled mechanism of a "buy out"

9  fee – which was negotiated by one of the defendant's employees.

10        The contention Smith was placed on a different shift, and plaintiffs were somehow

11  insulated, is almost nonsensical.  Motion, p.18, lines 16-23.  Smith had the run of the place,

12  both when on duty and off-duty.  And, he knew General Manager Hoffman would lie to the

13  police – as he did, even in the face of a rape allegation.

14        Defendants cite *Barmettler v. Reno Air, Inc.,* 114 Nev. 441, 956 P.2d 1382 (1998), in a

15  confusing and incorrect manner.  Defendants would use *Barmettler* for the proposition

16  plaintiffs must demonstrate physical injuries to sustain a cause of action for outrage.  This is

17  simply not true.  *Barmettler* discusses physical injuries in the context of ***negligent*** infliction of

18  emotional distress – NOT in the content of the tort of outrage, which is directly analogous to

19  the tort of *intentional* infliction of emotional distress.  114 Nev. at 447-48.  *Barmettler* does not

20  help defendants.  Rather, the case generally describes the type of fact pattern presented herein,

21  i.e., a situation involving system criminal/very threatening conduct, for profit.  The Court

22  wrote:

23        To establish a cause of action for intentional infliction of emotional distress,
    Barmettler must establish the following:

24

25          (1) extreme and outrageous conduct with either the intention of, *or reckless
      disregard for*, causing emotional distress, (2) the plaintiff's having suffered
      severe or extreme emotional distress, and (3) actual or proximate causation.

26  114 Nev. at 447; *citing Star v. Rabello*, 97 Nev. 125, 125, 625 P.2d 90, 91-92 (1981).

27  The Complaint alleges a sordid, criminal and outrageous course of conduct, perpetrated by the

28

1   defendants with an eye to maximizing illicit profits, and with reckless disregard as to the

2   consequences.  Defendants knew *before* Smith committed an Open and Gross Lewdness

3   against Chelsea Long he was a sexual predator.  They did not care.  That, after all, is why he

4   was wandering about, unsupervised.  Any doubt as to the lengths defendants are willing to go

5   to shield their chief panderer is resolved by looking at General Manager Hoffman's blatant lie

6   to Reno police, subsequent to a woman allegedly having been raped in defendants' women's

7   room.  No discipline was implemented against Hoffmann.  Defendants undertook no measures

8   to correct the lie.  General Manager Hoffman kept his job and Smith was not prosecuted.

9   Defendants ratified the lie, but now claim they have not behaved with reckless disregard.

10          The tort of outrage is not based on alleged negligence by defendants.  It is based on

11  defendants' deliberate conduct, e.g., their decision to conduct a prostitution business, in

12  violation of the law and their licensure, and to use Smith to assist in that business.  It is based

13  in material part on defendant's long-term profiteering, based on prostitution.  And, it was one

14  of the worst forms of prostitution. Defendants did not confine their activities to women who

15  were already in the life, for years.  Because of a fairly specialized sexual taste of a number of

16  their clientele, defendants actively cajoled and pressured very young women, after getting them

17  drunk, to become prostitutes.  That conduct is despicable.  Standing alone, it is sufficient to

18  sustain the tort of outrage.

19          Defendants claim the Keshmiris should be dismissed re the outrage cause of action.

20  Motion, p.18, lines 24-27.  This claim is premised on the contention the Keshmiris are not

21  accused of outrageous behavior.  That is an erroneous premise.  Plaintiffs allege the Keshmiris

22  "routinely orchestrate, oversee, direct and profit from criminal activities on the premises of the

23  Spice House, and oversee, direct, acquiesce to and profit from criminal activities engaged in on

24  the premises."  Complaint, p.2, lines 20-23. The Complaint goes on: "That is, because of the

25  Keshmiris' ***personal involvement*** in illegal activities, such as cajoling women to engage in

26  prostitution; providing alcohol to underage women so as to encourage them to engage in

27  prostitution; conspiring to arrange for prostitution transactions; etc., they are to be deemed the

28  employers of plaintiffs and therefore personally liable."  Complaint, p.3, lines12-16 (emphasis

1
2
3

added).  Where defendants have acquired the perception the Complaint does not accuse the Keshmiris, in their individual or personal capacities, of outrageous and actionable conduct is not clear.  The Complaint clearly articulates such accusations throughout its entirety.

4

**Argument: THE KESHMIRIS DID RATIFY SMITH CONDUCT, BOTH DIRECTLY AND TACITLY.**

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Defendants cite *Peterson v. Miranda*, 57 F.Supp.3d 1271, 1280 (D. Nev. 2014) for the proposition a principal may be liable via ratification if the conduct was done on the principal's behalf, or if the conduct was in furtherance "of their employment or within the scope of their employment."  57 F.Supp.3d at 1280.  Here, Smith was a sort of professional sexual predator.  His regular duties including illegally providing alcohol (the defendants' alcohol) to underage women, in conjunction with pressuring them to engage in prostitution, for the defendants' enrichment.  An integral part of the tort of outrage herein is this aspect of Smith's conduct – ***in conjunction with the daily ratification the other defendants' indulged in.***  In other words, Smith was present in the workplace for the primary purpose of engaging in criminal activities offensive to both plaintiffs.  He crossed the line from professional criminality into crimes done for personal pleasure with Ms. Long and the patron who alleges she was raped on March 15, 2019, true.  And, defendants ratified that misconduct. Defendants rehired Smith after his summer, 2018, assault, battery and false imprisonment of Ms. Long. Defendants, through General Manager Hoffman's lie, ratified the March 15, 2019 alleged rape - in conjunction with failing to discipline Hoffman for that lie, and otherwise allowing the lie to stand.  A trier of fact could easily find defendants ratified Smith's conduct in order to protect themselves from Smith, to wit, Smith knows all about defendants' prostitution business. He knows which City Councilmen are alleged to have gone out of the Spice House door with young women.  He knows the identities of other customers.  He knows how much monies the defendants received in cash, per his prostitution endeavors.  He probably knows whether defendants were reporting this income to the U.S. Treasury.  Smith is in a position to badly hurt the other defendants. That would explain why he was rehired and the knee-jerk cover-up General Manager Hoffman engaged in on Smith's behalf.  Although Smith's personal sexual

Page 21

1  misconduct may not have been done on behalf of the defendants' business, the defendants'

2  ratification of Smith's criminal misconduct did inure to the defendants' advantage, both

3  financial and penal.  Furthermore, this is not a strict *employment* analysis.  Smith and the other

4  defendants have participated in an ongoing *criminal* enterprise for years.  Each night, or rather

5  in the early morning hours,  General Manager Hoffman would preside over splitting up the

6  illegal proceeds.  The trier of fact could easily find defendants ratified Smith's actions for the

7  purpose of furthering concealment of their criminal activities.

8        I have not been able to find any caselaw which would insulate these defendants from

9  the consequences of knowingly ratifying Smith's criminal activities.  The proposition, that in

10 the context of an ongoing criminal enterprise, other defendants should be insulated from the

11 consequences of ratifying a co-conspirator's conduct – because that conduct was technically

12 outside the scope of his employment (even though it was predictable and 100% consistent with

13 his known criminal propensities) is repugnant to principles of equity and common law.

14                                    Conclusion

15        This is a case which needs to be litigated.  It is an extraordinary case involving a

16 continuing criminal enterprise.  The defendants have done immense damage to this community.

17 They have exploited many young women.  They have traumatized many women, who turned

18 away from the life defendants tried to entice them into.  With regard to other women, they have

19 permanently diverted their lives down a bad road.  The encouraged and cosseted a known

20 predator and now claim surprise at the full extent of his depravity.  They should stand trial in

21 open court and be reduced to trying to defend the indefensible.  The Motion should be denied,

22 almost entirely (with the exception of Ms. Ramos' negligence claims).   Plaintiffs request the

23 opportunity to try this case.

24        Dated this 12th day of March, 2020.

25                                         /s/ Mark Mausert
                                         Mark Mausert
26                                        NV Bar No. 2398
                                         729 Evans Avenue
27                                        Reno, NV 89512
                                         TELEPHONE:(775) 786-5477
28                                        FACSIMILE: (775) 786-9658
                                         *Attorney for Plaintiff*s

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CERTIFICATE OF SERVICE**

I hereby certify, under penalty of perjury that I am an employee of Mark Mausert Law Office; I am over the age of eighteen (18) years; I am not a party to, nor hold an interest in this action; and on the date set below, I sent via United States Postal Service mail and electronic service, a true and correct copy of, **PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS,** to the addressee(s) listed below:

Ricardo Cordova
Anthony Hall
Kendra Jepsen
Simons Hall & Johnston PC
6490 S. McCarran Blvd., Suite F-46
Ren, NV 89509

DATED this 12th day of March, 2020.

_/s/ Brittaney Martin_____
Brittaney Martin
Employee of Mark Mausert